UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| PHYLLIS BEAMON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:03-CV-1186-SEB-JPG |
| | ) | |
| UNUM LIFE INSURANCE COMPANY | ) | |
| OF AMERICA, | ) | |
| Defendant. | ) | |

**ENTRY GRANTING Defendant's MOTION FOR SUMMARY JUDGMENT**

This matter comes before the Court on Defendant's Motion for Summary

Judgment on all the claims presented in the Complaint filed by Phyllis Beamon ("Ms.

Beamon") on January 30, 2003.  Ms. Beamon brought this action under the Federal

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et. seq.

claiming a wrongful denial of benefits, pursuant to 29 U.S.C. § 1132(a)(1)(B), and that

Unum Life Insurance Company of America ("Unum") wrongly terminated her long term

disability benefits ("LTD benefits") for which she was eligible under the Coca-Cola

Bottling Company Employee Benefit Plan (the "Plan").  Defendant counters that its

denials of benefits were neither arbitrary nor capricious and that Ms. Beamon has failed

to provide evidence of an ongoing physical or psychiatric disability.  The Court, having

fully considered the parties' arguments, for the reasons discussed below, <u>GRANTS</u>

Defendant's Motion for Summary Judgment.

<u>Factual Background.</u>

1.      *The Terms of the Plan*.

The Plan was established and/or maintained by Hondo, Inc., d/b/a Coca-Cola Bottling Company ("Coca-Cola").  Benefits under the Plan were funded, at least in part, by LTD insurance ("Policy") via a group policy issued by Unum to Hondo.  Compl. ¶¶ 1-4.

To be eligible for long term benefits under the terms of the Policy, the insured must be "disabled" within the meaning of the Plan language, which provides:

> "Disability" and "disabled" means that because of injury or sickness:
>
> 1.      the insured cannot perform each of the material duties of his regular occupation; and
>
> 2.      after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience . . .

R. 862.[1]  With regard to submitting proof of disability, the Policy provides:

> Proof of claim must be given to the Company.  This must be done within 90 days after the end of the elimination period.
>
> If it is not possible to give proof within these time limits, it must be given as soon as reasonably possible.  But proof of claim may not be given later than one year after the time proof is otherwise required, unless the insured is legally unable to notify the Company.
>
> Proof of continued disability and regular attendance of a physician must be given to the Company within 30 days of the request for the proof.
>
> . . . .

---

[1] Items in Ms. Beamon's medical file are referenced by their Bates control number.

> The benefit will be paid for the period of disability if the insured
> gives to the Company proof of continued disability and regular
> attendance of a physician.

R. 850, 860.  Finally, with regard to the administration of Plan benefits, the Policy

provides:

> In making any benefit determination under this policy, the Company
> shall have the discretionary authority both to determine an employee's
> eligibility for benefits and to construe the terms of this policy.

R. 867.

      B.    *Ms. Beamon's Claim for Disability Benefits*.

Ms. Beamon is a former employee of Coca-Cola having worked at their

Indianapolis plant.  (Answer of Defendant Unum Life Insurance Company of America

("Answer"), ¶ 2.)  As an employee of Coca-Cola Bottling, Ms. Beamon was a participant

in the Plan, pursuant to which employees were eligible for LTD benefits; Unum was

responsible for processing claims for LTD benefits under the Plan.  (Answer, ¶¶ 3, 4, 5.)

Ms. Beamon's position with Coca-Cola was as a quality control technician.  On

February 18, 2000, she quit working and filed a claim for LTD benefits.  R. 2.  Although

Ms. Beamon indicated on her disability claim form that she was unable to work due to

lower back pain, her attending physician, Dr. Lawrence DeGan ("Dr. DeGan"), indicated

that Ms. Beamon was unable to work "due to depression and job stress."[2]  R. 876-875, 24,

---

[2] A subsequent telephone conversation between Mary Louise Cote of Unum and Kathy
Henry, human resources representative at Coca-Cola, revealed that Ms. Beamon originally
stopped working because of stress and depression, but when her short term disability benefits
ended, she filed a disability claim based on her back problems.  R. 30.

3

2.

On July 5, 2000, Dr. Troy Payner ("Dr. Payner") performed a discectomy on Ms. Beamon to correct an L5-S1 disc bulge.  R. 145.  The discectomy occurred with no complications and Ms. Beamon was expected to resume work approximately two months following her surgery, which would have been September 5, 2000.  R. 145, 14.

Prior to surgery, when Dr. Payner met with Ms. Beamon, he noted her excessive complaints of pain.  R. 144.  He provided her with pain medication but required that she agree in writing not to request any additional pain medication until after her surgery.  R. 144.

In a September 1, 2000, letter to Dr. DeGan, Dr. Payner indicated he did "not have a good explanation for [Ms. Beamon's persistent post-surgery pain]."  R. 146-147.  He found that Ms. Beamon's incision had healed "very well" and that there was "no evidence of the previously present disc herniation."  R. 146-147.  Dr. Payner also noted that Ms. Beamon used a wheelchair during the office visit but not when she was outside his office.  R. 145.

On September 6, 2000, Dr. Payner completed the attending physician's statement ("APS") indicating that a secondary condition of "anxiety disorder" was contributing to Ms. Beamon's disability and that she was "unable to perform work of any kind."  R. 196/187.[3]  Dr. Payner also stated that Ms. Beamon's prognosis was "uncertain" and that

_____

[3] These two pages are part of the same document and are out of sequence in the claim
(continued...)

4

she would not be able to work for at least six-to-twelve months.  R. 196/187.

Ms. Beamon had an appointment with Dr. David Ratzman ("Dr. Ratzman") on November 8, 2000, complaining of lower back and right leg pain.  R. 213-210.  Dr. Ratzman reviewed Ms. Beamon's medical records and noted:

> The Patient specifically asked me for a prescription for narcotics today. Because of her psychological history, possible symptom exaggeration, and manipulative behavior, I told her that I would not under any circumstances prescribe narcotics for her.  She has been receiving them from her primary care physician and she is to continue to do so.  She was not pleased with this response.

R. 210.

On November 20, 2000, Ms. Beamon consulted a psychiatrist, Dr. Chris Bojrab ("Dr. Bojrab") of Indiana Health Group, with complaints of anxiety, depression, impaired memory and concentration, and tearfulness.  R. 246-240.  Dr. Bojrab adjusted her medication, recommended that she visit a therapist, and scheduled her for a follow-up at his next available appointment.  R. 240.

During this time, Unum continued to gather information related to Ms. Beamon's claim.  As part of the claims process, Clinical Consultants, Bonnie Smith, R.N. ("Ms. Smith") and Dr. Daniel Krell, M.D. ("Dr. Krell"), reviewed her medical information relating both to her physical and mental condition in an effort to determine whether she

---

[3](...continued)
file.

5

was disabled.  R. 197, 191-188.[4]  After reviewing Ms. Beamon's medical information,

both Ms. Smith and Dr. Krell agreed that:

> It appears claimant's physical functional capacity was impaired after
> her lumbar discectomy of 7/5/00.  Given that the medical record reveals
> claimant to have recovered without complication, impairment from the
> surgery is supported through 10/5/00.  After that time, claimant's
> [complaint of pain] is considered to be self-reported and not objectively
> verified by diagnosis.  Given the pending litigation and claimant's
> stress at work, it appears there are other reasons she does not want to
> [return to work].  Also considering the health status of her son and her
> desire to care for him at home, it would be difficult for her to [return to
> work] and provide 24-hour care for him.

R. 197, 191.

   With regard to whether Ms. Beamon suffered from a mental disability, Dr. Krell

noted that further investigation would be necessary.  R. 190.

   The medical review concluded:

> Claimant has undergone subsequent pain injections as well as remained
> on a significant number of pain medications.  It is also noted in the
> medical record that claimant has been noncompliant with her
> medication regimen and one [attending physician] described her as
> drug-seeking. . . .  Claimant has presented to [attending physician's]
> office for appointments in wheelchair, which [attending physician] feels
> is unnecessary.  Claimant is reported to behave strangely and walk with
> a bizarre limp that is not clinically correlated to her physical condition.
> . . . Claimant has expressed her desire to have her son move home with
> her so she could take care of him.  Given her report of severe physical
> impairment, this seems inconsistent.  Most recent diagnostics do not
> reveal significant abnormality that would account for her continued
> complaints of severe pain.

---

   [4] This clinical review report is out of order in the record.  The proper order for the five-
page report is numbered 197, 191, 189, 188, 190.

6

R. 190.

On January 2, 2001, Unum concluded its initial review and approved total LTD benefits from August 16, 2000, through October 5, 2000.[5]  R. 694.  Unum informed Ms. Beamon that psychiatric medical records had been requested from Dr. Bojrab and, when received, would be reviewed to assess her eligibility for ongoing benefits.  R. 694.  Unum also explained that if Ms. Beamon were to receive Social Security Disability Income ("SSDI"), her disability benefits from Unum will be reduced by the SSDI amount.  R. 694.

Following Unum's initial approval of benefits, Ms. Beamon reported that she was seeking additional surgery and was to meet with a neurosurgeon, Dr. Henry Feuer ("Dr. Feuer"), to discuss an L5-S1 fusion, which would require a four-to-six month recovery period.  R. 229-227, 683.

On January 26, 2001, Unum Customer Care Specialist, Mary Louise Cote ("Ms. Cote"), spoke with Ms. Beamon and explained that, in light of her upcoming surgery, Unum would continue to pay benefits until she recovered.  R. 683.  Ms. Cote informed Ms. Beamon that a check for benefits from October 5, 2000, through January 5, 2001, was forthcoming and that Ms. Beamon would be receiving monthly checks thereafter until she recovered from her fusion surgery.  R. 683.

On February 7, 2001, Ms. Beamon had another appointment with Dr. Bojrab, who

---

[5] August 16, 2000, is the first day after the Policy required 180-day elimination period.

noted that in November 2000 he had recommended that Ms. Beamon consult a therapist but that she had not done so.  R. 398.

On April 24, 2001, Dr. Feuer performed the L5-S1 fusion and estimated that Ms. Beamon would be unable to work until at least September 2001.  R. 739.

Ms. Beamon had a follow-up appointment with Dr. Feuer on May 23, 2001, who reported that she was coming along "reasonably well" but continued to seek a lot of pain medication.  R. 506. By August 2001,[6]  Dr. Feuer noted that Ms. Beamon had regained normal strength, and, though she continued to complain of pain, she had improved since surgery.  R. 491.  Dr. Feuer also noted that Ms. Beamon continued to seek a lot of pain medication, though he was trying to reduce her use of narcotics and in particular to get her off Oxycontin.  R. 491.  Ms. Beamon next returned to Dr. Feuer more than a year later, on June 24, 2002.  R. 492.  In the meantime, Unum continued its efforts to obtain the necessary documentation to support Ms. Beamon's claim for ongoing benefits.  R. 665, 663.

On or about August 27, 2001, Ms. Beamon informed Unum Customer Care Specialist Chori Bradley ("Ms. Bradley") that she was being treating by Dr. DeGan, although apparently Ms. Beamon did not provide contact information for Dr. DeGan's office to Unum at that time.  R. 668-67.

On September 5, 2001, Ms. Bradley spoke with Ms. Beamon regarding her claim

---

[6] Ms. Beamon saw Dr. Feuer in July and August 2001, but did not submit those records to Unum until 2003. See R. 490-491.

for ongoing benefits, recording their conversation as follows:

> I explained that we periodically need to get updated medical information to monitor her status and update the file to show proof of ongoing impairment. [Claimant] stated that she is disabled and that is all we should need to know.  I explained that it wasn't that we didn't believe her, but that we needed evidence in the file.
>
> I explained again that we needed the authorization in order to obtain the records we needed from Dr. Feuer, [claimant] stated that he keeps telling her she is all healed but that she knows there is something wrong, states she doesn't trust him, he lies.  I asked claimant if she has seen anyone else? She stated "Why would I? They are all in cahoots, they'll just tell me the same thing he does."  I asked the [claimant] if she was seeing Dr. Bojrab (psych[iatrist]) any more, [claimant] stated she didn't trust him either, she told him she was having trouble with the [medications] so he told her to double her dose.  Hasn't seen him in a while, I asked if she was seeing anyone else in his place, [claimant] stated "Yeah, Jesus."  [Claimant] also stated that she was thinking about looking for someone new.

<p style="text-align:center">*   *   *   *</p>

> [Claimant] stated she doesn't trust anyone since she "has been done bad, not just by the doctors."  I advised the [claimant] that we were not trying to take advantage of her and that it was in her best interest to sign the form and send it in ASAP.  [Claimant] finally agreed that she would do so, stating that she was going to make a copy for herself so it might be a few days.  I advised her that the sooner we got the form the better.  [Claimant] then stated that she didn't know who this form was from because she gets her checks from a place spelled UNUIM.  I told the [claimant] that if she looked at her check stubs she would see that we are spelled UNUM. [Claimant] did not believe me, stated that we had changed our name.  I assured her that we had not.  [Claimant] then stated that we were a month behind on her payments.  I checked BAS and advised [claimant] that her check was released on 9/1/01 so she wouldn't [receive] it until the end of this week or the beginning of next week.  She said we were still behind a month.  I explained that this is how her benefits are supposed to be paid.  She said ok.  I told [claimant] I would be expecting the auth[orization] soon.  She said ok.

<p style="text-align:center">9</p>

R. 663-662.

On September 10, 2001, Ms. Beamon telephoned Ms. Bradley to say that she had spoken with "Carla" at Dr. Feuer's office and that the year-old authorization form would suffice for Dr. Feuer to release Ms. Beamon's records.  R. 660.  When Ms. Bradley telephoned "Carla" directly, however, Ms. Bradley was told that Dr. Feuer would instead need an updated authorization form.  R. 660.  Ms. Bradley sent "Carla" a new authorization form to obtain Ms. Beamon's signature to release Dr. Feuer's medical records.  R. 660.

By October 1, 2001, Unum still had not received any of Ms. Beamon's updated medical records.  R. 659, 283.  "Carla" in Dr. Feuer's office verified that she had forwarded the authorization form to Ms. Beamon for her signature but that Ms. Beamon had neither signed nor returned it thereby permitting Dr. Feuer to release her records.  R. 283.

On November 8, 2001, Ms. Beamon was admitted to the psychiatric unit at Valle Vista Hospital in Greenwood, Indiana, ("Valle Vista Hospital") where she was diagnosed with major depression and bi-polar disorder.  R. 467-445.  Ms. Beamon's "Master Problem List" also cited chronic pain, ®. 527), which was described as "pain in R[ight] hip, back, and leg to the point of requiring constant medication, pain r/t being wheelchair bound, pain out of control."  R. 525.  The hospital records indicated that during her stay Ms. Beamon was "constantly demanding about her pain pills" and "would constantly ask for more pills."  R. 536-37.  The hospital records also noted that "[i]n individual sessions,

10

she would not appear to be in any kind of physical agony and distress, however, she would keep on saying she needed more pain medication." R. 537. Ms. Beamon underwent a series of evaluations and was described in hospital records as "med seeking," "very disruptive," "argumentative," and "very easily irritable." R. 447-446. At the time of her discharge on November 16, 2001, the hospital noted that Ms. Beamon "was still quite manipulative and was greatly focused on her pain and still wanted to have more pain medication." R. 536.

Having no knowledge of Ms. Beamon's admission to and treatment at Valle Vista Hospital, Unum again wrote Ms. Beamon on November 20, 2001, requesting that she provide updated medical information, such as office notes, test results, and consultative reports, in order for Unum to determine her eligibility for ongoing benefits. R. 654.

On that same day, Ms. Beamon telephoned Ms. Bradley at Unum to inform her that she had just been released from Valle Vista Hospital in Greenwood, Indiana. R. 651-650. Ms. Bradley described their telephone conversation, as follows:

> [Claimant] stated she is not doing well at all, said she just got out of the "Loony bin." [Claimant] stated she was admitted to Valle Vista Hospital a week and half ago, stated she had a nervous breakdown and she is a "paranoid schizo." [Claimant] stated she cannot see strange people with her diagnosis and because she is a "paranoid schizo." I asked the [claimant] what her diagnosis was, she stated she did not remember and that it was all being sent to me. I asked who was sending me the information. [Claimant] told me that she was at Valle Vista Hospital in Greenwood, Indiana at 317-887-1348. I asked again if this information was already being sent. [Claimant] stated that I would have to get it. [Claimant] stated that she had gotten a letter from some nurse that wanted to meet with her tomorrow, stated that she cannot see strange people right now. I asked if she had called the nurse

11

to let her know this, [claimant] stated that she had left a voice mail for her saying she would not be able to meet with her.  [Claimant] stated that the nurse is a liar from the pits of hell anyway and that she will not sit with someone who lies like that. I asked what she was referring to. [Claimant] stated that she had [received] a letter stating that she had not tried to return the nurse's calls when she had returned her call.  I explained that the letter may have been written before she was able to return her call since she was in the hospital. [Claimant] stated that was not the case and continued citing biblical verses as well as repeating that the nurse was a "liar from the pits of hell" several times.  I explained to the [claimant] that we would not continue our discussion in this fashion. [Claimant] said ok, seemed to calm down a little.

I asked the [claimant] if she knew why the RN was coming to speak with her. [Claimant] said she did not know.  Asked if somebody was trying to take her money from her.  I explained that no one was trying to take her money from her and that the RN was gong to go over a letter discussing what we would need to support her claim for ongoing disability benefits.  I asked the [claimant] if she thought it would be a good idea for us to go over the letter together, she stated she did not think she would be able to understand it.  I said ok.  Asked what she thought I should do. [Claimant] stated she didn't know.  I asked if she had anyone who could go over the letter with her if I mailed it to her. [Claimant] stated she could take it to her psychiatrist to go over it together.  I told her that sounded like a good idea and stated that I would mail the letter out to her today. Asked that she call me to let me know when she [received] it.  [Claimant] said she wasn't sure she could remember to do this.  I explained that at the bottom of the letter my name and number was listed and if she could try to remember once she got it to call just to let me know.  I would appreciate it.  [Claimant] stated that she would try and could probably remember.

[Claimant] then asked what she could do to help.  I told her that I would suggest her sending anything she could to support her not being able to work, she stated that we should have that information already.  I explained that we did not have any information supporting her disability. [Claimant] became irate, stated that I needed to get this information, started listing off [doctor]'s names, stating she wasn't sure what the addresses or phone numbers were and that they had plenty of info [regarding] her disability.  I reminded her that she asked if there was anything she could do. [Claimant] said ok and asked me to repeat

12

all of things she needed to get.  I explained again that anything she thought  would support her disability is what she should get to us. [Claimant] stated that she needed time to remind her of all of the [doctor]'s she had told me about. I told her that I did not have all of the names. [Claimant] stated that she was trying to help me and that I wasn't helping her to help me.  I explained that she was trying to help herself and that any information she sent in was going to affect her and not me. [Claimant] asked again "What can I do to make your job easier?" I told her I had explained everything I needed and that I would mail the letter today explaining further. [Claimant] stated that she hoped our call was being monitored for quality purposes.  I asked the [claimant] if there was a problem with the quality of our conversation. [Claimant] stated that of course there was because she is trying to help me do my job and I won't help her.  I explained again that it was up to her to get us any information she thought we should evaluate and that I would expect to hear from her at the end of next week once she [received] the letter.

I asked the [claimant] the name of her psychiatrist.  She stated she wasn't sure who she would be seeing.  Stated she had not decided yet. I asked what the name of the [doctor] she saw in the hospital was. [Claimant] stated Boozy or Boozer or something like that. Stated  she could not remember.  I asked if this was the Dr. she was thinking about seeing from now on, she said she wasn't sure. [Claimant] stated she hoped she didn't lose the letter since people come in her house while she is sleeping and help themselves.   I told her I hope that her psychiatrist would be able to help with the letter. [Claimant] stated she had someone better than that to help her . . . her congressman.  I said ok and reminded her to please call me once the letter was [received].  I told her that I would request information from the hospital.  She stated this was fine and she didn't care if I saw it.  [Claimant] told me that I had been very helpful and wished me a happy thanksgiving.  I told her the same. [Claimant] stated this was the nicest thing any one ever said to her today except for one other person. I told her that I hope things start going better for her. [Claimant] stated she is just tired of being jerked around. I thanked her for calling.

R. 651-650.

Ms. Bradley sent Ms. Beamon a follow-up letter that same day with the following

explicit instructions:

- Once you receive the enclosed letter, you will call me to confirm its receipt.
- Once received, you will take the letter to your psychiatrist to discuss.
- You will send us any information you can obtain that will support your ongoing impairment.
- I will request records from your recent hospital stay at Valle Vista Hospital in Greenwood, Indiana.

R. 649.

On November 28, 2001, Ms. Beamon called Unum and told Ms. Bradley that she had been hospitalized on November 7, 2001, for back pain and headache, but that she did not stay overnight.  Ms. Beamon said she returned to the hospital around November 10, 2001, also for back pain.  Finally, Ms. Beamon said that she had a new family doctor, Dr. Vidya Miller ("Dr. Miller"), and that she had returned to see Dr. DeGan in September or October.  Ms. Bradley reminded Ms. Beamon that she needed to provide medical information to document her continued disability and that she had only thirty days in which to do so.  R. 646.

In December 2001, Ms. Beamon returned to Dr. Bojrab's psychiatric practice at Indiana Health Group after a ten-month lapse.  R. 391-390, 403-400.  However, Ms. Beamon did not see Dr. Bojrab, himself, until January 9, 2002–their first office visit in nearly eleven months.[7]  R. 403, 390.

On December 21, 2001, Ms. Beamon faxed to Ms. Bradley at Unum a December

---

[7] It appears that the lengthy absence was due in part to cancelled appointments and "no-shows" on the part of Ms. Beamon.

14

12, 2001, prescription note written by Dr. DeGan stating that Ms. Beamon suffered from chronic pain due to lumbar disk disease and depression.  Dr. DeGan also opined that Ms. Beamon was unable to work due to these conditions.  R 373.  Ms. Beamon noted on the fax that she would have more information in January and would get information to Ms. Bradley as soon as possible.  R. 373.

On January 16, 2002, Dr. Bojrab wrote a letter to Unum ®. 391-389) regarding Ms. Beamon's disability claim, highlighting Ms. Beamon's attempts to obtain prescription drugs in excess of the prescribed amounts and her general failure to keep appointments and comply with treatment recommendations, stating:

> Based on the limited information at hand and her noncompliance with treatment recommendations and keeping her appointments [sic] I am unable to lend a strong support to her requests for continued disability. She may well qualify for disability, however, I am not in a position to make this determination based on our limited contact.  I would recommend a review of her case by either a disability specialist or a vocational rehabilitation specialist in addition to a more comprehensive psychiatric evaluation.  Such an evaluation would typically require at least a one hour appointment and is typically not part of her covered benefits under her insurance.

R. 391-389.

On March 12, 2002, Unum conducted a clinical review of Ms. Beamon's claim based on her psychiatric treatment.  R. 407-406.  Clinical Consultant, Maria Long, LCSW, ("Ms. Long") reviewed Ms. Beamon's file and concluded that, although Ms. Beamon may suffer from major depression or bipolar disorder, there is no data indicating how her work capacity was impeded.  R. 407-406.  Psychiatric Consultant, Dr. Glenn

Higgins, Ph.D., ("Dr. Higgins") agreed with Ms. Long's analysis, stating:

> As noted in the previous review (4/12/01), it appears that the claimant is not pursuing regular psychiatric care. The psychiatrist, Dr. Bojrab, who last saw her 1/9/02 and who had previously seen her only on 2/7/01, indicated that he believes more extensive treatment is indicated. It appears the claimant may be experiencing substantial psychiatric symptomatology but it is not possible to make any definitive determination regarding actual level of impairment without additional clinical information.

R. 406.

On March 20, 2002, Unum's orthopedic unit conducted a clinical review based on Ms. Beamon's claim for physical impairment. R. 409. Orthopedic Consultant, Dr. R. Snyder, D.O. ("Dr. Snyder"), was of the view that because Ms. Beamon's last orthopedic office note was nearly a year prior and all the current records were related only to psychiatric treatment, Ms. Beamon's claim file did not support any ongoing physical impairment. R. 409.

C.   *Unum's Decision to Terminate Ms. Beamon's Benefits*.

On March 22, 2002, after paying full disability benefits for nineteen months, Unum terminated Ms. Beamon's LTD benefits on grounds that she failed to provide proof of ongoing "disability" under the terms of the Policy. R. 417-415. In a letter to Ms. Beamon of that date, Unum explained its reasons for terminating her benefits:

> Enclosed you will find copies of letters we sent you concerning your claim for Long Term Disability benefits. In these letters dated 8/31/01, 10/1/01, 10/22/01, 11/20/0l and 11/29/01 as well as in telephone conversations on 9/5/01, 11/20/01, 11/28/01 and 12/17/01, we advised you that we needed to receive proof of your disability within 30 days of our request. To date, we have received some but not all of the

16

information we requested.  Therefore, we proceeded with the evaluation of your claim based on the information contained in your file.  This information has been reviewed by our medical staff and we have determined that there is no evidence to support a physical or psychological impairment that would preclude you from performing the duties of your own occupation as a quality control technician.

The information we have received and reviewed is as follows: office treatment notes from Dr. Christopher Bojrab from 2/7/01 through 1/9/02, as well as a letter from Dr. Bojrab dated 1/16/02 stating that he was unable to make a determination on your psychological status based on your limited contact with him.  In that letter Dr. Bojrab also noted that on 1/16/02 when you requested he write a letter regarding your level of disability he suggested, "that she schedule an appointment with a therapist and expressed my concern that if her symptoms were at a level that in her mind constituted a disability impairing her from returning to work, that she should certainly be involved in more intensive outpatient care.  As of today, she has not scheduled a follow up appointment with a therapist although she does have a follow up appointment scheduled with me for March 11, 2002."

We also received information from Dr. Vidya Miller's office.  This information included an off work note, stating that you should not return to work until l/7/02 and that on that date you would be following up with Dr. Bojrab.  The most recent office treatment note in the file is dated 5/23/0l and completed by Dr. Henry Feuer.  In that note, Dr. Feuer commented on postoperative x-rays which showed satisfactory lumbar lordosis, very satisfactory placement of your instrumentation at L5-S1, [sic] Dr. Feuer also notes that there is ample fluffiness of bone over the transverse process and sacral ala bilaterally.  Unfortunately, we are unable to determine your current physical capacity without updated information to support your ongoing impairment.  Since there is no support for any ongoing psychological or physical impairment that would preclude you from performing the duties of your regular occupation as a quality control technician, your benefits have been terminated and your claim for ongoing long term disability benefits has been closed.

R. 417-416.

Unum informed Ms. Beamon in its termination letter that she could appeal the

17

decision but must do so in writing within ninety days from the date of the letter, that is, by June 19, 2002.  R. 416.  Unum explained:

> Your written appeal should include your comments and views on the issues, as well as any new documentation you may wish us to consider. You may also request copies of documents contained in your claim file which were pertinent to the denial decision.

R. 416.

> D.   *Ms. Beamon's First Appeal*.

On June 12, 2002, Unum received a forty-six-page fax from Dr. DeGan's office,[8] consisting of psychiatric records from Valle Vista Hospital dated November 2001, ®. 467-445), an abdominal and pelvic CT scan dated October 2001, ®. 444-440), and emergency room records from Community Hospital dated May 4, 2002.  ®. 439-423)[9] Ms. Beamon contends that this fax also contained notes from at least seven separate visits to Dr. DeGan's office but there is no substantiation in the record that Dr. DeGan's notes were in fact included in the fax.

At Unum's request, a Clinical Consultant, Sheila Weiss ("Ms. Weiss"), reviewed the emergency room records and abdominal/pelvic CT scan from Community Hospital, noting that Ms. Beamon's chief complaints were abdominal pain, nausea, and vomiting. R. 472.  Because the records contained no data relating to an orthopedic condition, Ms.

---

[8] Ms. Beamon did not personally submit a written request for review, but instead asked that Dr. DeGan's office send her medical records to Unum.  R. 468.

[9] Ms. Beamon was admitted into Community Hospital on May 4, 2002 for stomach and back pain.  R 801.

Weiss concluded that Unum's earlier determination regarding an orthopedic disability

remained unchanged. R. 472.

Also at Unum's request, Clinical Consultants, Ms. Long and Dr. George Dominiak

("Dr. Dominiak"), reviewed the psychiatric records from Valle Vista Hospital,

concluding:

> The additional data indicates a hospitalization for major depressive
> disorder 11/8/01 but the [treatment] and course in the hospital indicates
> a very clear focus by [Ms. Beamon] on her pain issues. [Ms. Beamon]
> was noted to be very demanding about her pain pills and was resistant
> to any kind of solution or advice regarding her complaints and was not
> open to any recommendations about her treatment. This additional data
> does not alter the decision made on 3/12/02.
>
> *   *   *   *
>
> The hospital records show some inconsistencies. The diagnosis is
> depression but depressive symptoms are not described – mostly anger,
> uncooperative behavior, and a focus on pain.
>
> The discharge documentation states there are no psychological
> symptoms yet a [global assessment of functioning] of 30 is given –
> perhaps representing overall functioning in the context of pain and
> irritability. Zyprexa was prescribed with no clear rationale. Also, the
> insured was not referred to ongoing psychiatric treatment. Rather, she
> was referred to a pain management clinic. Psychiatric impairment is
> not substantiated by these records.

R. 470.

By July 10, 2002, Unum had completed its review and issued a final decision

upholding the original denial of benefits, explaining that the additional information

submitted by Dr. DeGan's office was insufficient to reverse its initial decision. R. 474-

473. Unum further explained:

19

We have reviewed the additional information you recently sent us. We regret this information was not sufficient to reverse our previous decision.

Information from Valle Vista Hospital and Community Hospital of Indianapolis was received and reviewed by our medical staff. Based on this information we have determined that there is no psychiatric impairment substantiated by the information provided by Valle Vista Hospital. Based an the information provided, you were discharged by Valle Vista on 11/16/01 at which time it was not recommended that you follow up with psychiatric treatment [sic] rather you were referred to a pain management clinic. There is no support for a psychiatric impairment based on the additional information you submitted to us.

You also submitted information from Community Hospital of Indianapolis. This information was also reviewed by our medical staff. The information provided was regarding a chief complaint of abdominal pain, nausea and vomiting. There was no medical information submitted in regards to your back pain or any other orthopedic condition as of 3/22/02 that would change our prior decision to deny further benefits.

The medical information submitted does not support any impairment which would preclude you from performing the requirements of your own occupation as a quality control technician.

R. 474-473.

E.    *Ms. Beamon's Second Appeal.*

On July 24, 2002, after receiving Unum's July 20, 2002, letter affirming the termination of benefits, Ms. Beamon telephoned Ms. Bradley at Unum to ask for another level of review. R. 477-475. Ms. Bradley told Ms. Beamon to submit her request in writing and it might be considered. R. 477.

On September 27, 2002, Ms. Beamon submitted a written request for a second level of review, to which Unum agreed by letter dated October 10, 2002. R. 478, 485.

On December 11, 2002, Unum completed its second review and upheld its decision to terminate benefits.  R. 481-483.[10]  On December 12, 2002, Unum wrote to counsel for Ms. Beamon reporting that, after completing its second review, it was affirming its decision to deny further benefits consistent with its previous decision.  R 483.  The December 12, 2002, letter stated that Ms. Beamon's "… claim was closed because she failed to provide proof of ongoing disability."  R. 482.  In addition, the December 12, 2002, denial explained:

> We note that on appeal Ms. Beamon provided documentation of a hospitalization on May 4, 2002 [sic] for abdominal pain, nausea and vomiting.  However, we have not been provided with medical records to support any physical impairment or treatment between the date her claim was closed (March 21, 2002) and this hospitalization.  In addition, we have not been provided with any medical documentation later than this hospitalization. We have determined that she has not provided ongoing proof of disability or regular attendance of a physician for a physical condition.
>
> We have also concluded that Ms. Beamon has not provided proof of ongoing disability or of the regular attendance of a physician with regard to any psychiatric impairment.  It appears that Ms. Beamon is not pursuing regular psychiatric care.

R 587.

Unum also informed counsel for Ms. Beamon that it would allow counsel forty-five days to review Ms. Beamon's file in order to provide any additional medical documentation in support of her claim for benefits and that such documentation "would need to include proof of continued disability as well as the regular attendance of a

---

[10] The letter is also found at pages 586-588 of the administrative record.

physician for the time for which benefits are being sought." R 482.[11]

      F.    *Ms. Beamon's Third Appeal.*

On February 3, 2003,[12] nearly seven months after Unum issued its decision

upholding its previous denial of Ms. Beamon's claim for further benefits, Ms. Beamon

submitted an eighty-six-page document, which included the original forty-six-page fax

from Dr. DeGan's office as well as various notes from office visits by Dr. DeGan. See R.

574-488.[13]

The only new information not previously reviewed by Unum included: (1) letters

by Dr. Feuer for two office visits dated July and August 2001, recording that, although

Ms. Beamon still appears to suffer severe low back pain, she continues to improve from

her surgery and would be able to return to work two-to-four months post-surgery, ®.

490[14], 491); (2) a June 24, 2002, letter from Dr. Feuer stating that he had not seen Ms.

Beamon in more than ten months and that, though her examination revealed normal

strength, he observed Ms. Beamon walking "very cautiously and us[ing] a cane," ®. 503);

---

[11] At Ms. Beamon's request, Unum twice extended this forty-five day deadline, the first time until February 3, 2003, and the second time until February 10, 2003. R. 824, 827.

[12] This letter was misdated as February 3, 200<u>2</u>; it actually was sent on February 3, 200<u>3</u>.

[13] In its Brief in Support of Summary Judgment, Unum maintains that the office visit notes by Dr. DeGan were already reviewed by Unum. Id. at p. 19 at ¶ 46; Id. at p. 30. This statement appears to have been in error as there is no indication in the record that Dr. DeGan's office notes were ever received by Unum prior to February 3, 2003.

[14] The July letter also states Ms. Beamon "has significant issues with her mental status, having undergone psychiatric evaluation." R. 490.

(3) an October 23, 2002, note from Dr. DeGan requesting an assessment of Ms. Beamon's need for a "lift chair" and "craft-o-matic" bed, ®. 564); (4) an October 31, 2002, emergency room report indicating that Ms. Beamon presented with headache, nausea, and vomiting and again displayed "drug-seeking behavior," ®. 513-510); and (5) notes by Dr. DeGan from at least fifteen office visits dated, June 12, 2002, to January 15, 2003, which reflected Ms. Beamon's persistent complaints of severe pain over this time period, the lack of improvement in her symptoms over time, her repeated medication-seeking behavior, her refusal to see a pain management specialist, and Dr. DeGan's belief that Ms. Beamon was unable to work due to her pain.  ®. 498-493).[15]

---

[15] Pertinent excerpts from the notes relating to the office visits are as follows:

1.   Dr. DeGan saw Ms. Beamon on September 12, 2001.  Dr. DeGan noted that Ms. Beamon was "… still having chronic back pain and R[ight] sided sciatica." and that "[s]he is in so much pain that she cannot do her [physical therapy]."   However, Dr. DeGan also noted that he would refer her to a pain management specialist and that Ms. Beamon resisted his efforts to refer her back to a neurosurgical specialist.  R 502.

2.   Dr. DeGan saw Ms. Beamon on December 3, 2001, for a pap smear.  Dr. DeGan noted that Ms. Beamon has pain going down her right leg and that her nerves are not controlled and that she has chronic pain due to lumbar disc disease.  Dr. DeGan also noted he had to refuse Ms. Beamon's request for a higher dose of Xanax and advised her that this was a matter to take up with her psychiatrist.  R 502.

3.   On December 12, 2001, Dr. DeGan wrote a prescription note stating that Ms. Beamon is suffering from chronic pain due to lumbar disc disease and depression.  Dr. DeGan also opined that Ms. Beamon was unable to work due to these conditions.  R 373; R 502.  This office note was originally sent in a fax to Unum on December 21, 2001.  R. 636.

4.   Dr. DeGan saw Ms. Beamon on April 10, 2002, for a follow up on her lumbar disc disease, spinal stenosis, chronic pain, and depression. Dr. DeGan notes that Ms. Beamon "… remains in chronic disabling pain requiring high doses of narcotics." Dr. DeGan also states that "[h]er back pain is essentially unchanged" and that in his opinion Ms. Beamon is "totally disabled from all occupations" and it is "unlikely that she will ever be able to have gainful employment."  R 501.

5.   Dr. DeGan saw Ms. Beamon on May 7, 2002.  Dr. DeGan notes that Ms. Beamon is in a

(continued...)

<div style="border-top:1px solid black; width:30%;"></div>

[15](...continued)
wheelchair and he declined to increase the dose or amount of her MS Contin prescription. R 500.

6.    Dr. Trierweiler saw Ms. Beamon on May 17, 2002.  Dr. Trierweiler notes that Ms. Beamon is having extensive back pain and needs a refill of her back pain medication, but that she is limited to receiving a one-week prescription.  R 499.

7.    Dr. DeGan saw Ms. Beamon on May 22, 2002.  Dr. DeGan notes that Ms. Beamon is still having significant pain. He observes that Ms. Beamon is in obvious pain, that she is ambulating slowly with a cane, that she has difficulty rising from a chair, and that she suffers chronic pain due to degenerative disc disease and depression.  Dr. DeGan also notes that Ms. Beamon asked to receive her MS Contin and Xanax prescriptions early because he would be on vacation the following week.  R 499.

8.    Dr. DeGan saw Ms. Beamon on June 12, 2002.  Dr. DeGan notes that Ms. Beamon "… continues to have terrible trouble with back pain."  Explaining:

> [The pain] radiates around the L[eft] flank to the groin and down both legs to the feet. She wants to get a wheelchair. After struggling through the grocery store, she is down in bed for the next 2 days with pain.

R 747.

9.    Dr. DeGan saw Ms. Beamon on July 2, 2002, for a follow up on her chronic low back pain and degenerative disc disease.  Dr. DeGan notes that Ms. Beamon is "[s]till emotionally labile, alternately anger, irritated and depressed."  He states that she is ambulating with a cane and that "[s]he has a bent forward posture and has some difficultly arising from a chair."  Dr. DeGan also describes Ms. Beamon as "narcotic dependent."  R 498.

10.   On July 31, 2002, Dr. Trierweiler had to refuse Ms. Beamon's request for a shot of the pain killer Demerol.  Dr. Trierweiler gave Ms. Beamon a sample of the pain contract and advised her to keep her appointment with the pain specialist which was arranged by Dr. DeGan.  R. 497.

11.   Dr. DeGan saw Ms. Beamon on August 21, 2002.  Dr. DeGan notes that Ms. Beamon's "… pain is so bad she spent five days out of the last [week] in bed and was unable to get up.  Says her nerves are 'still [a] mess.'  She is having some pain that radiates to the R[ight] lower quadrant of the [abdomen]. This is not new."  Dr. DeGan also states that Ms. Beamon visited the Saint Vincent Pain center for an initial interview and expressed hope that the pain management center would take over her medical management.  R 497.

12.   On October 1, 2002, Ms. Beamon had an appoint with Dr. DeGan to discuss her nerve medication.  Dr. DeGan notes that Ms. Beamon apparently fired Dr. Bojrab, the third psychiatrist of whom Dr. DeGan is aware that she has fired.  R. 495.  Dr. DeGan expressed that he would prefer a psychiatrist manage Ms. Beamon's psychiatric medications; however, Dr. DeGan agreed to refill her Xanax prescription until Ms. Beamon could obtain a new psychiatrist.  R. 495.

l3.   Dr. DeGan saw Ms. Beamon on October 21, 2002, for a follow up on her chronic pain.

<div style="text-align:right;">(continued...)</div>

---

[15](...continued)

He states that:

> [h]er main concern today is she cannot ambulate far enough to get around to doctor's offices or to do her shopping, etc. She is unable to propel herself in a standard wheelchair because vigorous use of her upper extremities also exacerbates her back pain. She also needs an adjustable hospital type bed. She has a very expensive, relatively new mattress, but is unable to sleep in it because it aggravates her back pain. She winds up sleeping upright in her computer chair, but then her legs swell.
>
> She walks very slowly, bent over, with a cane. She has obvious difficulty arising from a chair.

R 495.  Dr. DeGan notes that Ms. Beamon says she saw a doctor at the Indiana University Neurology Department and that she is being referred to the Psychiatry Department.  R 495.

14.   Dr. DeGan saw Ms. Beamon on November 1, 2002.  He notes that he received a call from the emergency room because Ms. Beamon was requesting pain medication.  Dr. DeGan expresses concern that half of Ms. Beamon's Tylox prescription is apparently unaccounted for and worries that if she consumed them that Ms. Beamon "has taken far too much ACETAMINOPHEN."  Dr. DeGan refuses to give her any additional Tylox or prescribe any additional narcotics to replace it.  R. 494.

15.   Dr. DeGan saw Ms. Beamon on November 20, 2002, for a follow up on her chronic pain. He notes that:

> [h]er back pain is unremitting and she rates it as an 8/10. It is causing her to spend 3 d[ays] out of 5 in bed. The pain is in her low back and radiated around to the lower [abdomen] and down the R[ight] leg and sometimes down the L[eft] leg. She is not getting relief from her pain [medications] …
>
> She still has not gotten to appointment [with] psychiatrist at [Indiana University Medical Center] because she says she is waiting for a wheelchair so she can navigate the campus. She rises w[ith] great difficulty from a chair. She ambulates [with a] cane.

R 494.

16.   Dr. DeGan saw Ms. Beamon on December 30, 2002, for a follow up on her chronic pain. He notes that

> [s]he had a really bad spell and spent 2 [weeks] in bed. She is improving a little bit now. Nearly developed a bedsore during that period of time.

R. 493.  Dr. DeGan declined to increase Ms. Beamon's prescriptions for MS Contin and Norco.  R. 493.

17.   Dr. DeGan saw Ms. Beamon on January 15, 2003, and notes that Ms. Beamon "… has degenerative disc disease with chronic disabling pain."  R. 493.   Dr. DeGan also notes

(continued...)

Ms. Beamon has offered no explanation for the delinquency of the July and August 2001 letters from Dr. Feuer as well as the office notes from Dr. DeGan, which  were not submitted within the Policy's ninety-day deadline for proofs of claims.  See R. 850 (stating: "Proof of claim must be given to the Company.  This must be done no later than 90 days after the end of the elimination period").

From August 21, 2001, through Unum's March 22, 2002, denial of benefits, Unum regularly and often requested Ms. Beamon's medical records, including direct requests to the following physicians and hospital on the corresponding dates: Dr. Feuer on August 21, 2001, and October 1, 2001, ®. 669, 659); Dr. Miller on November 29, 2001, ®. 644); Dr. Bojrab on March 1, 2002, ®. 631); and Valle Vista Hospital on March 1, 2002, ®. 631).  However, there is no evidence of record that Unum ever requested medical records directly from the office of Dr. DeGan between August 21, 2001, through March 22, 2002, and Unum has not explained this gap.  There also is no evidence that Unum ever informed Ms. Beamon or Dr. DeGan's office that the records faxed to Unum on June 12, 2002, did not include office visit notes or any other documentation reflecting treatment by Dr. DeGan.

After Unum failed to respond to her third appeal, Ms. Beamon filed her complaint in this litigation on August 15, 2003, alleging that her benefits were improperly denied.

Legal Analysis

[15](...continued)
that Ms. Beamon ran out of her Norco prescription a few days early.  R. 493.

26

I.      *Standard of Review*

Benefit determinations in ERISA cases arising under 29 U.S.C. § 1132(a)(1)(B) are reviewed by the court *de novo*, unless the plan administrator has "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  If the plan vests discretionary authority in the plan administrator, the standard of review by the court is "arbitrary and capricious."  Hightshue v. AIG Life Ins. Co., 135 F.3d 1144, 1147 (7th Cir. 1998); see also Morgan v. Cigna Group Ins., 2003 WL 722804, *6 (S.D.Ind. 2003) (Barker, J.).

Here, the Policy grants full discretionary authority to Unum; there is no dispute between the parties on this.  Accordingly, our review of Unum's denial of benefits to Ms. Beamon proceeds according to the "arbitrary and capricious" standard, which entails a review of the administrator's decision in order to determine whether it was unreasonable. Morgan, 2003 WL 722804, * 6; Schaub v. Consolidated Freightways, Inc. Extended Sick Pay Plan, 895 F.Supp. 1136, 1140 (S.D.Ind. 1995) (Barker, C.J.).  For a decision to be deemed reasonable, an administrator must be found to have "consider[ed] the factors that are relevant to the important aspects of the decision, and articulate[d] an explanation that makes a 'rational connection' between the issue, the evidence, the text and the decision made."  Schaub, 895 F.Supp. at 1140 (citing Cuddington v. Northern Indiana Public Service Co. (NIPSCO), 33 F .3d 813, 817 (7th Cir. 1994; Exbom v. Central States, Southeast and Southwest Area Health and Welfare Fund, 900 F.2d 1138, 1142-43 (7th

27

Cir. 1990)).

Our function in conducting this review is not "to decide whether we would reach the same conclusion as the Plan or even rely on the same authority." Mers v. Marriott International Group Accidental Death and Dismemberment Plan, 144 F.3d 1014, 1021 (7th Cir. 1998) (citing Cvelbar v. CBI Ill. Inc., 106 F.3d 1368, 1379 (7th Cir. 1997)).  We can conclude that the administrator's decision was arbitrary and capricious only if we are very confident that the plan administrator overlooked something important or otherwise seriously erred in appreciating the significance of the evidence.  Patterson v. Caterpillar, Inc., 70 F.3d 503, 505 (7th Cir.1995); see also  Morgan, 2003 WL 722804, *6 (stating: "An administrator's decision is arbitrary and capricious if the administrator entirely failed to consider an important aspect of the problem or offered an explanation for its decision that runs counter to the evidence").  We also must not set aside a plan's denial of benefits "if the denial was based on a reasonable interpretation of the plan documents." Mers, 144 F.3d at 1021 (citing Loyola Univ. v. Humana Ins. Co., 996 F.2d 895, 898 (7th Cir.1993)). Finally, when evaluating a plan administrator's decision under the arbitrary and capricious standard a court should generally consider only the evidence that was before the administrator when it made its decision.  Hess v. Hartford Life & Accident Insurance Co., 274 F.3d 456, 462 (7th Cir. 2001) (citing Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan, 102 F.3d 1435, 1437 n.1 (7th Cir. 1996)).

II.   *Plaintiff's argument for a de novo standard of review.*

Plaintiff argues that this court should conduct a *de novo* review of her denial of

28

benefits for three reasons: (A) Unum failed to respond to her third appeal of the termination of benefits; (B) Unum allegedly breached its fiduciary duty to Ms. Beamon by failing to request Dr. DeGan's office notes or informing Dr. DeGan's office that the office notes were not included in the June 12, 2002, fax; and (C) Unum failed to credit Dr. DeGan's diagnosis that Ms. Beamon was disabled and unable to work.  We find Plaintiff's arguments unpersuasive for the reasons addressed below.

      A.    *Unum's failure to respond to Ms. Beamon's Third Appeal*.

      Ms. Beamon contends that we should review Unum's termination of benefits under a *de novo* standard of review, first, because Unum failed to respond to her third appeal. Plaintiff's argument relies on the Ninth Circuit's holding in <u>Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan</u>, 349 F.3d 1098 (9th Cir. 2003) (using a *de novo* standard when the plan administrator failed to respond to the claimant's appeal); however, regardless of whether the Seventh Circuit would adopt similar reasoning, we do not view <u>Jebian</u> as applicable in this case.  In <u>Jebian</u>, the plan administrators failed to respond to the one and only appeal filed by the beneficiary, prompting the Ninth Circuit to hold that "there [was] no opportunity for the exercise of discretion and the denial is usually to be reviewed *de novo*." <u>Id.</u> at 1103.  Moreover, in <u>Jebian</u>, the plan administrators based their denial of benefits on a report which was identical to one on which they had relied two years previously in denying benefits–a

decision they eventually retracted on appeal.  Id. at 1102.[16]

In the case at bar, Unum substantially complied with its fiduciary obligations by providing written decisions to accompany its initial termination of benefits as well as its denials of Ms. Beamon's first and second appeals.  In addition, Unum's three written decisions all referenced the relevant medical documentation that formed the basis for the denial of benefits.  Accordingly, we conclude that, unlike the situation in Jebian, there are no grounds for depriving Unum's discretionary decisions of the deference they are entitled to by the abandoning the  arbitrary and capricious standard of review in favor of a de novo approach.[17]

B.      *Alleged breach of fiduciary duty by Unum.*

Plaintiff next argues that Unum violated its fiduciary duties by "failing to take affirmative action when confronted with glaring evidence that the office visit notes of Dr.

---

[16] The Jebian opinion also discloses that the beneficiary's medical circumstances had changed substantially in the intervening two years, which the plan administrators failed to acknowledge.

[17] This holding is consistent with opinions from the other Courts of Appeals that have addressed the issue.  See, e.g., Finley v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan, 379 F.3d 1168, 1173 (10th Cir. 2004) (utilizing the "substantial compliance" rule to ascertain the standard of review when an appeal is deemed denied due to failure to respond); McGarrah v. Hartford Life Ins., 234 F.3d 1026, 1031 (8th Cir. 2000) (holding that "the mere presence of a procedural irregularity is not enough to strip a plan administrator of the deferential standard of review . . . a claimant must also present evidence that the irregularity raises-- [sic] serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim. . .") (citations omitted); Southern Farm Bureau Life Ins. Co. v. Moore, 993 F.2d 98, 101 (5th Cir. 1993) (holding that "for factual determinations under ERISA plans, the abuse of discretion standard of review is the appropriate standard; that is, federal courts owe due deference to an administrator's factual conclusions that reflect a reasonable and impartial judgment") (internal quotation omitted).

DeGan were not included in the materials submitted for Plaintiff's first appeal" and by "refusing to write to his office for medical records or otherwise communicate . . ."  Pl.'s Reply Brief at 7, 13.   Plaintiff further notes that while Unum requested medical records from several other physicians,[18] Unum failed to request records from Dr. DeGan, whom Defendant knew was of the opinion that Ms. Beamon was disabled.

Although we find Unum's lack of explanation for its failure to request Dr. DeGan's records troubling, we conclude that in committing this error Unum did not violate its fiduciary duty to Ms. Beamon.  We do not examine Unum's failure to request Dr. DeGan's medical records in a vacuum.  This misstep must be analyzed in the context of Unum's persistent, sustained and earnest attempts to obtain Ms. Beamon's medical records.  The record reflects repeated, good-faith efforts by Unum to obtain medical records from Ms. Beamon to substantiate her disability claims.  Specifically, Unum wrote to Ms. Beamon in an effort to obtain her medical information on at least five occasions: August 31, October 1, October 12, November 20, and November 29, 2001.  R. 665, 659, 656, 654, 649, 644-643.  In addition, Unum's representative, Ms. Bradley, spoke with Ms. Beamon by phone concerning their need to obtain her medical records on at least four occasions: September 5, November 20, November 28, and December 17, 2001.  R. 663, 651-650, 646-645, 639.  The reports of these nine instances reveal that Ms. Beamon often

---

[18] Unum requested medical records directly from the following offices on the dates provided: Dr. Feuer on August 21, 2001 and October 1, 2001 (R. 669, 659); Dr. Miller on November 29, 2001 (R. 644); Dr. Bojrab on March 1, 2002 (R. 631); and Valley Vista Hospital on March 1, 2002 (R. 631).

was uncooperative, resistant, or outright opposed to Unum's efforts to obtain her medical

records.  In light of the substantial efforts undertaken by Unum to obtain Ms. Beamon's

medical records and Ms. Beamon's sustained pattern of uncooperativeness with Unum,

we find no compelling basis on which to conclude that Unum violated its fiduciary duty

to Ms. Beamon by failing to request medical records from only one of Ms. Beamon's

many physicians.

> C.    *Unum's failure to credit Dr. DeGan's diagnosis that Ms. Beamon was disabled.*

Plaintiff's third contention is that Unum should not receive the benefit of the

deference inherent in the arbitrary and capricious standard-of-review because Defendant's

conduct evidences "a pattern of willful ignorance" in that "Defendant did not care what

Dr. DeGan had to say or what he might have to say about Plaintiff." Pl.'s Reply Brief at

11.  This argument is without merit.

The Supreme Court has held that ERISA plan administrators may not "arbitrarily

refuse to credit a claimant's reliable evidence, including the opinions of a treating

physician."  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).

However, plan administrators do not have to "accord special weight to the opinions of a

claimant's physician; *nor may courts impose on plan administrators a discrete burden of

explanation when they credit reliable evidence that conflicts with a treating physician's

evaluation*."  Id. (emphasis added).  In fact, the Supreme Court has specifically rejected

"a 'procedural' rule, which requires a hearing officer to explain why she rejected the

opinions of a treating physician." <u>Id.</u> at 834 n.4.  In this case, Unum clearly credited the substantial evidence that conflicted with Dr. DeGan's diagnosis; there was no further duty on Unum's part to explain why it rejected Dr. DeGan's opinions, and we decline to adopt a stricter standard of review than that which is widely applied by other courts in these circumstances that would undermine Unum's decision to terminate benefits.

III.     *Analysis of Unum's decisions under the arbitrary and capricious standard of review.*

Finally, we move to a review of the decisions by Unum to terminate Ms. Beamon's disability benefits, including its initial determination as well as and the subsequent appeals, under the arbitrary and capricious standard of review.  For purposes of analytical clarity, we have categorized Ms. Beamon's disability claim into two parts: first, Unum's initial termination decision and Ms. Beamon's first two appeals; and, second, the information Ms. Beamon submitted in her third appeal to which Unum never responded. We examine each of these categories in detail below.

A.     *Unum's decisions to terminate Ms. Beamon's benefits and to deny her first two appeals.*

As of March 22, 2002, as well as in conjunction with the first and second appeals, there was substantial information in Ms. Beamon's medical records undermining the validity of or contradicting the substance of her claims of disability.  The record is replete with the views of several doctors, all of whom independently documented Ms. Beamon's medication-seeking behaviors and what they termed her excessive focus on obtaining

33

pain medications.[19]  In addition, several doctors, expressed skepticism regarding Ms.

Beamon's claims of pain and cited evidence of symptom exaggeration.[20]  The record

further indicates that Ms. Beamon repeatedly failed to pursue the various courses of

treatment recommended by her physicians and failed to follow through on referrals as

well.[21]  Most significantly, multiple doctors and consultants concluded that there was no

objective evidence supporting Ms. Beamon's claim of physical disability[22] or

---

[19] For example, prior to performing back surgery, Dr. Payner noted Ms. Beamon had excessive complaints of pain and made her agree in writing that she would not ask for additional pain medication until after surgery.  R. 144.  Dr. Ratzman stated that he "would not under any circumstances prescribe narcotics for her."  R. 210.  Dr. Feuer also noted that Ms. Beamon continued to seek a lot of pain medication; and that he was trying to reduce her use of narcotics and get her off Oxycontin.  R. 491.  Valle Vista Hospital noted that Ms. Beamon "was still quite manipulative and was greatly focused on her pain and still wanted to have more pain medication."  R. 536.

[20] Dr. Payner noted that Ms. Beamon used a wheelchair while in his office but not outside his office.  R. 145.  Dr. Ratzman noted evidence of Ms. Beamon's possible symptom exaggeration and manipulative behavior.  R. 210.  Similarly, Valle Vista Hospital records indicated that "[i]n individual sessions, [Ms. Beamon] would not appear to be in any kind of physical agony and distress, however, she would keep on saying she needed more pain medication,"  R. 537.

[21] For example:  Ms. Beamon's psychiatrist, Dr. Bojrab, noted Plaintiff's "noncompliance with treatment recommendations and keeping her appointments."  R. 391-389, R. 398, R. 403-400.  Similar to the eleven-month time gap between visits to Dr. Bojrab, Ms. Beamon also waited over ten months between visits to see her neurosurgeon, Dr. Feuer.  R. 491-492.  Valle Vista Hospital referred Ms. Beamon to a pain management clinic; however, there is no evidence in the record that Ms. Beamon ever visited a pain management clinic.  R. 470.

[22] Dr. Payner indicated in a post-operative summary, "I do not have a good explanation for her persistent pain." R. 147-146.  Orthopedic consultant Dr. Snyder concluded that Ms. Beamon's claim file did not support an ongoing physical impairment.  R. 409.  Ms. Smith and Dr. Krell, after reviewing Ms. Beamon's medical file at Unum's request, concluded that Ms. Beamon's complaints of pain are "considered to be self-reported and not objectively verified by diagnosis." R. 197, 191.  Ms. Weiss, also at Unum's request, reviewed the emergency room records and abdominal/pelvic CT scan from Community Hospitals and noted that the records

(continued...)

substantiating her claim of a psychiatric disability.[23]  During the process of evaluating

Ms. Beamon's claim, Unum's review of Ms. Beamon's medical file involved at least

seven, separate individuals–three consultants and four physicians–all of whom concluded

that there was no objective medical documentation supporting a workplace disability

claim.[24]  Unum clearly attempted on numerous occasions to obtain Ms. Beamon's medical

records or have Ms. Beamon submit additional records which might have substantiated

her claim of a disability.  Ms. Beamon repeatedly failed to do so.[25]

     The three decisions by Unum supporting the termination of benefits[26] reflected the

medical information available to Unum at that time and all three decisions are fully

explained with reference to the available information.  Unum's conclusion that Ms.

Beamon had failed to submit objective evidence of a disability is well-grounded in their

records and in this litigation.  There is no evidence that Unum ignored relevant

--------

     [22](...continued)
contained no data relating to an orthopedic condition.  R. 472.

     [23] Ms. Beamon's psychiatrist, Dr. Bojrab, could not support Ms. Beamon's claim for a
psychiatric disability.  R. 391-389.  On Ms. Beamon's first appeal, Ms. Long and Dr. Dominiak
concluded, "Psychiatric impairment is not substantiated by these records."  R. 470.  Psychiatric
consultant Dr. Higgins stated: "[I]t appears that [Ms. Beamon] is not pursuing regular psychiatric
care."  R. 406.

     [24] Ms. Smith and Dr. Krell, R. 197, R. 191-188; Ms. Long and Dr. Higgins, R. 406-407;
Dr. Snyder, R. 409; Ms. Weiss, R. 472; Ms. Long and Dr. Dominiak, R. 470.

     [25] See, e.g., R. 283, R. 416, R. 468, R. 477, R. 646, R. 651-649, R. 654, R. 659, R. 663-
662.

     [26] The three decisions were the original termination decision and the denials of the first
two appeals.  See, e.g., R. 417-416, R. 474-473, R 587.

information about Ms. Beamon's persistent complaints about pain; rather, what is clear is Unum's conclusion that these complaints were not supported by an objective medical diagnosis.  That conclusion was buttressed by Ms. Beamon's persistent medication-seeking behavior and other conduct that was inconsistent with her claimed disability.  We have no satisfactory legal basis to second-guess Unum's decision.  See Patterson v. Caterpillar, Inc., 70 F.3d 503, 506 (7th Cir. 1995).  For these reasons, we conclude that Unum's approach in evaluating Ms. Beamon's disability claim was "cautious, careful, and thorough," (Id.), and, accordingly, that Unum's decision to terminate Ms. Beamon's disability benefits and to uphold that decision after two appeals was not unreasonable.

B.   *Examination of Unum's decisions in light of additional information submitted in Ms. Beamon's third appeal.*

Plaintiff also claims that, in light of Unum's failure to consider the information she belatedly submitted in her third appeal, the decision to terminate her benefits was arbitrary and capricious.  As previously noted, while Unum has offered no explanation for its failure to respond to Ms. Beamon's third appeal, it contends that, in any event, nothing she submitted in that appeal calls into doubt its prior termination decisions.

Unum's lack of response to Ms. Beamon's third appeal and its failure to articulate a reason for this failure require us to examine the information that Plaintiff submitted in that third appeal to determine whether the supplemental documents do, in fact, corroborate the reasonableness of Unum's earlier decisions.

The first set of documents Ms. Beamon submitted were three letters from Dr.

36

Feuer to Dr. DeGan.  These documents, however, do not supply any evidence in support of Ms. Beamon's disability claim.  The three letters merely discuss Ms. Beamon's recovery from surgery, without substantiating medical information that would support her claim for continued disability as of March 22, 2002.  In fact, the additional records from Dr. Feuer do not provide any new information that could be construed as supplemental to Dr. Feuer's earlier diagnosis of Ms. Beamon, which had already been incorporated into the record.  Accordingly, we conclude that the letters from Dr. Feuer do not undermine the reasonableness of Unum's decision to terminate Ms. Beamon's of benefits.

Next, we turn to the office notes by Dr. DeGan, in which Ms. Beamon's numerous complaints of severe pain are documented and in which he opines that she is completely disabled.  We conclude in similar fashion that these office notes are not sufficient to undermine the reasonableness of Unum's decision to terminate Ms. Beamon's benefits. The principal deficiency in Dr. DeGan's notes is that they provide no independent, orthopedic information to substantiate Ms. Beamon's disability claim.  They merely document the same complaints of debilitating pain that Ms. Beamon had presented to Dr. Feuer, Dr. Ratzman, Dr. Payner, and the Valle Vista Hospital.  In addition, Dr. DeGan's office notes are filled with references to conduct by Ms. Beamon that Unum specifically had found to undermine Ms. Beamon's claim of disability.  For example, the majority of Dr. DeGan's office visit notes document Ms. Beamon's persistent medication-seeking behavior, describing either: Ms. Beamon seeking additional medication, Ms. Beamon attempting to refill her prescription early, Ms. Beamon running out of her prescriptions

37

early, or the doctor's concern regarding Ms. Beamon's use of narcotic pain medication.[27]

In addition, Dr. DeGan's notes reveal Ms. Beamon's pattern of refusal to comply with her

doctor's treatment recommendations–in this case, Dr. DeGan's efforts for more than a

year to have Ms. Beamon's care taken over by specialist, that is, to have her psychiatric

medication managed by a psychiatrist and her pain medication managed by a pain

management specialist, all of which efforts Ms. Beamon resisted.[28]

     In sum, as was true of the information Ms. Beamon submitted in her two prior

appeals, Dr. DeGan's notes reveal a lack of objective medical information supporting Ms.

Beamon's claimed disability, they document her repeated medication-seeking behavior,

---

[27] See, e.g., R. 502 (declining  on December 3, 2001, to increase Ms. Beamon's dose of Xanax); R. 500 (declining on May 7, 2002, to increase the dose or amount of Ms. Beamon's MS Contin prescription); R. 499 (Dr. Trierweiler noting on May 17, 2002, that Ms. Beamon is limited to receiving only a one-week prescription for back pain medication); R. 499 (describing on May 22, 2002, Ms. Beamon's desire to receive her MS Contin and Xanax prescriptions early); R. 498 (describing Ms. Beamon on July 2, 2002, as "narcotic dependent"); R, 497 (Dr. Trierweiler refusing Ms. Beamon's request for a shot of the pain killer Demerol on July 31, 2002); R. 495 (refilling on October 1, 2002, Ms. Beamon's Xanax prescription until Ms. Beamon could obtain a new psychiatrist); R. 494 (noting on November 1, 2002, a call from the emergency room because Ms. Beamon was requesting pain medication, describing Dr. DeGan's concern that Ms. Beamon "has taken far to much ACETAMINOPHEN," and refusing to prescribe additional Tylox or any other narcotics to replace it); R. 493 (declining on December 30, 2002, to increase Ms. Beamon's prescriptions for MS Contin and Norco); R. 493 (noting on January 15, 2003, that Ms. Beamon ran out of her Norco prescription a few days early).

[28] The record reveals that on September 12, 2001, Dr. DeGan noted that he would refer Ms. Beamon to a pain management specialist but that Ms. Beamon resisted his efforts to refer her back to a neurosurgical specialist, R 502; on July 31, 2002, Dr. Trierweiler advised Ms. Beamon to keep her appointment with the pain specialist which had been arranged by Dr. DeGan, R. 497; on August 21, 2002, Dr. DeGan expressed hope that Ms. Beamon's pain management center would take over her medical management, R 497; and on October 1, 2002, Dr. DeGan expressed that he would prefer a psychiatrist manage Ms. Beamon's psychiatric medications. R. 495.

and provide further evidence of Ms. Beamon's failures to follow through on her doctor's recommended treatments.

The only material distinction between Dr. DeGan's office notes and those of the other physicians involved in treating Ms. Beamon is that Dr. DeGan credited Ms. Beamon's subjective complaints of pain more fully than the other doctors (which may explain why Dr. DeGan was the only physician whom Ms. Beamon continued to consult on a regular basis). Because Dr. DeGan's office notes are not significantly different in terms of medical facts from the information Unum possessed prior to Ms. Beamon's third appeal, they do not contradict Unum's decisions; in fact, when Unum reached its prior decisions, it knew that Dr. DeGan believed Ms. Beamon was completely disabled.[29] Despite knowledge of Dr. DeGan's assessment of Ms. Beamon's condition, Unum repeatedly, and we think reasonably under the circumstances, credited the numerous medical professionals who reached an opposite conclusion. There is no legally justifiable basis on which we should now second guess that decision. See, Patterson, 70 F.3d at 506. Proper judicial review does not impose a "burden of explanation" on a plan administrator by which it would be required to explain (in Unum's case for a fourth time) its decision to rely on what it deemed to be credible evidence, even when that evidence is in conflict. Nord, 538 U.S. at 834. Ms. Beamon's third appeal did not supply information which undermines the reasonableness of Unum's decision to terminate her

---

[29] As of December 21, 2001, Unum knew Dr. DeGan believed Ms. Beamon was disabled and unable to work. See R. 373, R. 636.

benefits and, consequently, Unum is entitled to summary judgment in this action.

<center>Conclusion</center>

For the reasons set forth above, we conclude that Unum acted neither arbitrarily nor capriciously in terminating Ms. Beamon's disability benefits in March 2002 or in processing her appeals from the original termination decision.  Accordingly, Defendant's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

Date: <u>      05/06/2005      </u>

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copy to:

Robert L. Clark
HOEPPNER WAGNER & EVANS LLP
rclark@hwelaw.com

Mark E. Schmidtke
HOEPPNER WAGNER & EVANS LLP
mschmidtke@hwelaw.com

Ronald E. Weldy
ABRAMS & WELDY
weldy@abramsweldy.com